UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | CRIMINAL NO.:   22cr10265 |
| | ) | |
| v. | ) | Violations: |
| | ) | |
| AVTAR SINGH DHILLON, | ) | Count One: Willful Failure to Disclose Stock Sales |
| | ) | (15 U.S.C. §§ 78p(a)(3)(B) and 78ff(a); 17 C.F.R. § 240.16a-3(a)) |
| Defendant. | ) | |
| | ) | Count Two: Sale of Unregistered Securities; Aiding & Abetting |
| | ) | (15 U.S.C. §§ 77e(a)(1) and (c), 77x; 18 U.S.C. § 2) |
| | ) | |
| | ) | Count Three: Touting Compensation Nondisclosure Conspiracy |
| | ) | (18 U.S.C. § 371) |
| | ) | |
| | ) | Forfeiture Allegation: |
| | ) | (18 U.S.C. § 981(a)(1)(C) & 28 U.S.C. § 2461(c)) |

INFORMATION

At all times relevant to this Information:

General Allegations

Key Persons and Entities

1. The defendant, AVTAR SINGH DHILLON, was a Canadian citizen residing in California. At various times, DHILLON was the Chair of the Board of Directors of Arch Therapeutics, Inc., and the Chair of the Board of Directors and the Chief Executive Officer of Emerald Health Sciences.

2. Arch Therapeutics was a microcap biotechnology company with its principal place of business in Framingham, Massachusetts. Its common stock traded on the over-the-counter

market under the ticker symbol ARTH, and was registered with the Securities and Exchange Commission ("SEC") pursuant to Section 12 of the Securities Exchange Act of 1934. The company's annual report filed with the SEC on December 11, 2015 disclosed that "[t]here is not now, and there may not ever be, an active market for our Common Stock, which trades … in low volumes and at volatile prices."

3. Walk on Water Ventures LLC ("Walk on Water") was a limited liability company organized in California in or about May 2013. Daniel V. Martinez was Walk on Water's sole manager. Walk on Water's sole asset was 2.75 million shares of Arch Therapeutics.

4. Emerald Health Sciences ("EHS") was a private company incorporated and headquartered in Vancouver that held itself out as a life science investment company. DHILLON was a significant shareholder of EHS. EHS, in turn, owned a majority interest in Emerald Health Pharmaceuticals ("EHP"), a life sciences company headquartered in San Diego, California. As an officer and significant shareholder of EHS, DHILLON enjoyed and exerted significant influence over EHP, including by serving as a board member for a period of time.

5. From in or around March 2019 through in or around March 2021, EHP raised funds through a securities offering. Beginning in or about March 2020, the offering was touted by a subscription newsletter operating in Florida, Georgia, and elsewhere ("the Subscription Newsletter") with subscribers located throughout the United States, including in Massachusetts and Los Angeles County, California. Co-Conspirator 2 ("CC-2") worked as an analyst for the Subscription Newsletter and had influence over its coverage and promotions. Co-Conspirators 1 and 3 ("CC-1" and "CC-3") were individuals associated with CC-2.

Relevant Entities, Principles, and Definitions

6. The SEC is an independent agency of the executive branch of the United States government, responsible for enforcing the federal securities laws and promulgating rules and regulations thereunder.

7. "Transfer agents" are companies that, among other activities, issue and cancel certificates of a company's stock to reflect changes in ownership, such as when stock is changing hands.

8. Microcap stocks, also known as "penny" stocks, are among the securities that are subject to the federal securities laws. These stocks are, as a general matter, securities of publicly traded companies that have a low market capitalization and a low price per share (frequently, though not always, $1 or less). Microcap stocks are most often traded on the "over-the counter" market, rather than on national exchanges such as the New York Stock Exchange or the NASDAQ Stock Market, and tend to be thinly traded. In addition, less information is typically available to the investing public about companies that issue microcap stock.

9. Federal securities laws and regulations aim to protect investors by, among other things, (i) mandating certain disclosures by holders of large quantities of stock registered with the SEC, and (ii) limiting the ability of executive officers, directors, and large shareholders of stock to quickly sell significant amounts of their stock (regardless of whether it is registered with the SEC) in the open market.

10. For example, when a person or group of persons acquires beneficial ownership[1] of more than five percent of a voting class of stock registered with the SEC, the person or group is

---

[1] A beneficial owner is any person who directly or indirectly has (or shares) voting or investment power, which includes the power to sell or direct the sale of a security.

required to file a Schedule 13D with the SEC disclosing such ownership and setting forth background information about the owner(s) and their investment intentions. As part of their compliance programs, brokers often ask individuals seeking to deposit shares in microcap stocks whether they own or control more than five percent of the issuer's shares.

11. Similarly, control securities—which are securities owned by a person who directly or indirectly controls the issuer, either alone or as a member of a control group—are subject to Rule 144 of the Securities Act of 1933 ("Rule 144") [17 C.F.R. § 230.144]. The term "affiliate" is used to describe such a control person or group, and includes officers and directors of the issuer. Pursuant to Section 5 of the Securities Act of 1933 [15 U.S.C. § 77e], affiliates cannot sell shares using any means of interstate commerce unless a registration statement is in effect for the securities or unless an applicable exemption applies under Rule 144.

12. In the context of securities traded "over-the-counter"—such as most microcap stocks—Rule 144 provides that an affiliate cannot sell more than one percent of the issuer's total outstanding shares in any three-month period. As part of their compliance programs, brokers often ask individuals seeking to deposit shares in microcap stocks whether they are an officer, director, 10 percent shareholder, or otherwise an affiliate of the issuer.

13. Rule 144 also places limits on the sale of so-called "restricted" securities. Such shares, which are acquired directly from issuers and are not registered with the SEC, generally cannot be sold to the public and bear a legend indicating that they are "restricted." Shares that are registered with the SEC, and that do not bear a legend indicating they are restricted, are considered "unrestricted" or "free-trading," and may be sold in the market by non-affiliates. Rule 144 also identifies circumstances in which a shareholder holding restricted shares can have the legend removed, enabling the shares to become free-trading. One such circumstance is if the shareholder

is a non-affiliate and has held the shares for a certain period of time, typically either six months (if the company's shares are registered under Section 12 of the Securities Exchange Act of 1934) or one year (if the company's shares are not so registered).

14. Pursuant to Rule 16a-3 under the Securities Exchange Act of 1934 [17 C.F.R. § 240.16a-3], officers and directors of public companies with stock registered with the SEC are also required to disclose in public SEC filings the number of shares they beneficially own, as well as any changes to that number as they acquire or sell shares, on Forms 3 and 4, respectively. Beneficial ownership for purposes of these filings includes having or sharing direct or indirect pecuniary interest in the securities, meaning the opportunity, directly or indirectly, to profit or share in any profit derived from a transaction in the securities. Form 4 reports are required to be filed within two business days following the transaction date.

15. The SEC has also promulgated rules concerning securities offerings, including for unregistered offerings. Pursuant to Regulation A of the Securities Act of 1933 ("Regulation A"), companies are permitted in certain circumstances to offer and sell securities to the public with more limited disclosure requirements than what is traditionally required for publicly reporting companies. As a result, smaller companies in earlier stages of development are at times able to use Regulation A offerings to raise money in a more cost-effective manner than through more traditional registered offerings.

16. Securities offered for sale pursuant to Regulation A are at times the subject of published marketing materials or touting media coverage. Pursuant to Section 17(b) of the Securities Act of 1933 [15 U.S.C. § 77q(b)], those who receive consideration directly or indirectly from an issuer for publishing, giving publicity to, or circulating any advertisement or

communication that describes the issuer's security offered for sale are required to fully disclose the consideration received.

### Overview of Stock Sales & Willful Disclosure Failures

17.     Between in or about May 2013 and July 2016, DHILLON and Martinez worked together to sell Arch Therapeutics shares that DHILLON beneficially owned, in contravention of the federal securities laws. Specifically, DHILLON and Martinez placed 2.75 million of DHILLON's Arch Therapeutics shares into Martinez's entity Walk on Water, sold the shares in the open market without a valid exemption under Rule 144, and distributed approximately $1.34 million in sale proceeds primarily for DHILLON's benefit. DHILLON thereafter willfully failed to file Forms 4—as he was required to do—reporting the sales to the SEC and the investing public.

### The Stock Sales

18.     Arch Therapeutics became a public company via a reverse merger in or about June 2013. DHILLON, who was the Chair of the Board of Directors, was due to receive 10 million shares of Arch Therapeutics in connection with the reverse merger.

19.     DHILLON did not receive all of his shares in his name, however. Instead, at DHILLON's direction, Martinez created Walk on Water to hold 2.75 million of DHILLON's shares. Martinez created Walk on Water on or about May 17, 2013, and Arch Therapeutic's transfer agent issued Walk on Water a certificate for 2.75 million restricted shares on or about June 19, 2013. Walk on Water provided no consideration for the 2.75 million shares it received.

20.     In or about April 2016, Martinez opened a brokerage account for Walk on Water in Utah and submitted an application and related materials via email to deposit the 2.75 million Arch Therapeutics shares. In those materials, Martinez did not disclose the fact that DHILLON was the beneficial owner of the shares and that the purpose of the deposit was to sell the shares primarily

for DHILLON's benefit.  Instead, Martinez (as the managing member of Walk on Water) represented that "I am not a control person" and "I am not now, and have not been during the preceding three months, an officer, director, … or in any other way an 'affiliate' of the Company." Martinez also submitted the latter representation to a law firm to obtain a legal opinion that the shares were eligible to be deposited with, and sold by, the broker under Rule 144 and that registration of the shares with the SEC was not required.  The law firm issued the requested opinion letter in reliance upon Martinez's representations.  The broker, in turn, relied upon the opinion letter to proceed with the deposit.  In truth, however, Walk on Water's Arch Therapeutics shares were beneficially owned by DHILLON, the chairman of Arch Therapeutics, and therefore were not eligible for unrestricted sale without registration with the SEC.

21.    Relying on the legal opinion Martinez obtained, Arch Therapeutics' transfer agent issued free-trading shares to the broker for Walk on Water's account on or about April 14, 2016. At DHILLON's direction, Martinez soon began directing the broker to sell DHILLON's Arch Therapeutics shares into the open market.  Martinez submitted sale orders to the broker by email, usually within minutes of phone calls in which DHILLON directed Martinez to place such orders. In total, between in or about late April 2016 and early July 2016, Walk on Water sold all 2.75 million shares beneficially owned for DHILLON, equal to approximately 2.5% of Arch Therapeutics' outstanding shares, more than double the threshold permitted for an affiliate under Rule 144.  The sales generated more than $1.3 million in proceeds.

22.    As Walk on Water sold its Arch Therapeutics shares, Martinez directed that the proceeds be wired to a Walk on Water bank account.  Thereafter, between in or about late April 2016 and July 2017, Martinez signed Walk on Water checks at DHILLON's direction that distributed the majority of the proceeds to third parties for the benefit of DHILLON, with a small

portion distributed to Martinez himself. For example, Walk on Water distributed at least $645,000 to an individual who manages property for DHILLON, who in turn frequently distributed the money to an LLC entity for which DHILLON was the managing member. Walk on Water also distributed more than $80,000 to a treatment provider for a DHILLON family member, at least $18,000 to contractors providing goods or services to DHILLON's LLC entity, and $9,000 directly to DHILLON's LLC entity. Martinez also used a portion of the proceeds to pay other obligations related to Walk on Water's stock sales, including taxes, legal fees, and banking fees.

### Dhillon's Willful Disclosure Failures

23. DHILLON failed to report to the SEC or the investing public his beneficial ownership of the 2.75 million Arch Therapeutics shares held by Walk on Water, as he was required to do.

24. DHILLON similarly failed to file any Forms 4 with the SEC reflecting the sale of his Arch Therapeutics shares through Walk on Water despite knowing that he was required to do so because he was an affiliate of Arch Therapeutics.

### Overview of the Touting Compensation Nondisclosure Conspiracy

25. Beginning no later than in or around December 2019 and continuing until at least March 2021, DHILLON conspired with others known and unknown to the United States Attorney to cause EHP indirectly to compensate CC-2 to cause the Subscription Newsletter to tout a Regulation A offering by EHP without CC-2 and the Subscription Newsletter disclosing such compensation, as was required under the securities laws.

### EHP's Regulation A Offering

26. From in or around March 2019 through in or around March 2021, EHP raised approximately $60 million in gross investment proceeds through the sale of over 10 million shares

pursuant to a Regulation A offering (the "Offering"). Approximately $32.5 million of the funds raised through the Offering followed the promotional efforts of the Subscription Newsletter. The Subscription Newsletter sent communications to its subscribers throughout the United States, some of whom subsequently participated in the Offering.

Object and Purpose of the Conspiracy

27. The object of the conspiracy was to induce CC-2 to cause the Subscription Newsletter to tout the Offering by causing EHP to pay undisclosed compensation indirectly to CC-2 through CC-1 and CC-3.

28. The principal purpose of the conspiracy was to persuade subscribers of the Subscription Newsletter to participate in the Offering by purchasing EHP shares, thereby providing financing for the benefit of EHP and, in turn, its other direct and indirect shareholders, including DHILLON.

Manner and Means of the Conspiracy

29. Among the manner and means by which DHILLON and coconspirators known and unknown to the United States Attorney carried out the conspiracy were the following:

    a. Creating sham consulting and service agreements between EHP and intermediary individuals, including CC-1 and CC-1's brother, pursuant to which money and/or EHP securities would be provided directly and/or through intermediaries to CC-1 and CC-2 so that the Subscription Newsletter would tout EHP's offering;

    b. Transferring money paid pursuant to the sham agreements from CC-1 to CC-3, another intermediary individual, through a series of domestic and international bank accounts to obscure the source, destination, and nature of these payments before ultimately transferring the money to CC-2; and

  c. Publishing the Subscription Newsletter touting EHP's Offering without CC-2 and the Subscription Newsletter disclosing EHP's indirect compensation to CC-2, as was required.

 30. Through these various manners and means, EHP provided payments of approximately $1.7 million to CC-1 and another intermediary, after which CC-1 conveyed approximately $800,000 indirectly to CC-2.

Overt Acts in Furtherance of the Conspiracy

 31. Beginning no later than in or around December 2019 and continuing until at least March 2021, DHILLON, CC-1, CC-2, CC-3, and co-conspirators known and unknown to the United States Attorney committed and caused to be committed the following overt acts, among others, in the District of Massachusetts, the Central District of California, and elsewhere, in furtherance of the conspiracy:

  a. On or about December 11, 2019, DHILLON, CC-1, and CC-2 met in Las Vegas, Nevada. While in Las Vegas, DHILLON and CC-1 discussed the scheme.

  b. On or about January 14, 2020, in an electronic communication, CC-1 told DHILLON, "I spoke to [CC-2] at 1pm and I can guarantee some things if you can look after him, which I told him you can," to which DHILLON responded, "Call when you can."

  c. On or about January 22, 2020, DHILLON, in an electronic communication to CC-1, wrote, "All good on our end hope same."

  d. On or about March 2, 2020, the Subscription Newsletter published a "Note" touting EHP titled, "Curing Incurable Diseases and Giving Us Over 4,900% Potential Gains," which falsely stated, "[n]either the [Subscription Newsletter] nor its affiliates receive compensation for bringing this deal to you. As publishers of financial information, we make

general recommendations based on our own analysis."

   e. On or about March 10, 2020, in an electronic communication with CC-1, DHILLON said he would "nudge" an EHP executive who had failed to resume discussion regarding payments in furtherance of the conspiracy.

   f. On or about March 10, 2020, in a responsive electronic communication, CC-1 informed DHILLON that he had received an email from the EHP executive, but complained that it was "very vague with no mention of shares or the initial $100k invoice," adding, "I don't want you to miss out on the promo spot as everyone is fighting over it. I've had our friend ask about this twice since Sunday."

   g. On or about June 3, 2020, EHP entered into a sham consulting agreement with CC-1's brother to obscure the nature and purpose of EHP's compensation to CC-1 and to facilitate undisclosed compensation to CC-2 in furtherance of the conspiracy.

   h. On or about July 31, 2020, EHP entered into a sham consulting agreement with CC-1 to obscure the nature and purpose of EHP's compensation to CC-1 and to facilitate undisclosed compensation to CC-2 in furtherance of the conspiracy.

## COUNT ONE
Willful Failure to Disclose Stock Sales
(15 U.S.C. §§ 78p(a)(3)(B) and 78ff(a); 17 C.F.R. § 240.16a-3(a))

The United States Attorney charges:

32.     The United States Attorney re-alleges and incorporates by reference Paragraphs 1 through 31(h) of this Information:

33.     Between in or about April 2016 and July 2016, in the District of Massachusetts and elsewhere, defendant,

## AVTAR SINGH DHILLON,

did willfully and knowingly fail to file Forms 4 with the SEC reporting the sale of Arch Therapeutics shares that he beneficially owned as he was required to do under Section 16(a) of the Securities Exchange Act of 1934 and the SEC regulations promulgated thereunder.

All in violation of Title 15, United States Code, Sections 78p(a)(3)(B) and 78ff(a), and Title 17, Code of Federal Regulations, Section 240.16a-3(a).

COUNT TWO
Sale of Unregistered Securities; Aiding and Abetting
(15 U.S.C. §§ 77e(a)(1) and (c), 77x; 18 U.S.C. § 2)

The United States Attorney further charges:

34.    The United States Attorney re-alleges and incorporates by reference Paragraphs 1 through 31(h) of this Information:

35.    Between in or about April 2016 and July 2016, in the District of Massachusetts and elsewhere, defendant,

AVTAR SINGH DHILLON,

did willfully (a) make use of the means and instruments of transportation and communication in interstate commerce and of the mails to sell, through the use and medium of a prospectus and otherwise, securities as to which no registration statement was in effect and for which no exemption from registration was available; and (b) make use of the means and instruments of transportation and communication in interstate commerce and of the mails to offer to sell, through the use and medium of a prospectus and otherwise, securities as to which no registration statement was filed and for which no exemption from registration was available, to wit, shares of Arch Therapeutics, Inc.

All in violation of Title 15, United States Code, Sections 78e(a)(1) and (c) and 77x, and Title 18, United States Code, Section 2.

COUNT THREE
Touting Compensation Nondisclosure Conspiracy
(18 U.S.C. § 371)

The United States Attorney further charges:

36.     The United States Attorney re-alleges and incorporates by reference Paragraphs 1 through 31(h) of this Information:

37.     Between in or about December 2019 and March 2021 in the District of Massachusetts, the Central District of California, and elsewhere, defendant,

AVTAR SINGH DHILLON,

together with others known and unknown to the United States Attorney, conspired to commit the nondisclosure of touting compensation, that is, to knowingly and willfully communicate in interstate commerce and publish and circulate a notice, circular, advertisement, article, letter, and investment service and communication which, though not purporting to offer a security for sale, described such security in exchange for consideration received indirectly from an issuer without fully disclosing the receipt of such consideration and the amount thereof, in violation of Title 15, United States Code, Sections 77q(b) and 77x.

All in violation of Title 18, United States Code, Section 371.

FORFEITURE ALLEGATION
(18 U.S.C. § 981(a)(1)(C) & 28 U.S.C § 2461(c))

38.     Upon conviction of an offense in violation of Title 15, United States Code, Sections 78p and 78ff, Title 15, United States Code, Sections 77e and 77x, and Title 18, United States Code, Section 371, as set forth in Counts One through Three of this Information, the defendant,

AVTAR SINGH DHILLON,

shall forfeit to the United States, pursuant to Title 18, United States Code, Section 981(a)(1)(C) and Title 28, United States Code, Section 2461(c), any property, real or personal, which constitutes or is derived from proceeds traceable to the offense.

39.     If any of the property described in Paragraph 38 above, as being forfeitable pursuant to Title 18, United States Code, Section 981(a)(1)(C), as a result of any act or omission of the defendant:

    (a)   cannot be located upon the exercise of due diligence;

    (b)   have been transferred or sold to, or deposited with, a third party;

    (c)   have been placed beyond the jurisdiction of the Court;

    (d)   have been substantially diminished in value; or

    (e)   have been commingled with other property which cannot be divided without difficulty;

it is the intention of the United States, pursuant to Title 21, United States Code, Section 853(p), as incorporated by Title 28, United States Code, Section 2461(c), to seek forfeiture of any other property of the defendant up to the value of the property described in Paragraph 38 above.

All pursuant to Title 18, United States Code, Section 981(a)(1)(C) and Title 28, United States Code, Section 2461(c).

RACHAEL S. ROLLINS
United States Attorney

By: *[signature]*
JAMES R. DRABICK
Assistant U.S. Attorney

Dated: September 30, 2022